**DONNA LANGAN**
**A/K/A PETER KEVIN LANGAN**
**Reg. No.: 64023-061**
**FMC, CARSWELL**                                    Index No.: 21-cv-2524
**P.O. BOX 27137, UNIT 6**
**FT. WORTH, TX  76127**

          **Plaintiff,**

**v.**

**FEDERAL BUREAU OF PRISONS, MICHAEL CARVAJAL,**
**DR. ELIZABETH STAHL,  IAN CONNORS, DEFENDANT J. DOE 1,**
**DR. ALISON LEUKEFELD, SHANNON ROBBINS,**
**DON LEWIS, JENNIFER EPPLIN, TCCT MEMBERS**
**J. DOES 2-11, and TEC MEMBERS J. DOES 12-21,**
*all located at*
**320 FIRST ST. NW, SUITE 958**
**WASHINGTON, D.C. 20534**

          **Defendants.**

---

## COMPLAINT

Plaintiff Donna Langan,[1] by and through counsel states as follows:

## INTRODUCTION

1. The Eighth Amendment has long guaranteed that, when our government incarcerates

    someone, it has an obligation to care for their medical needs. Yet, when it comes to gender

    dysphoria, the Federal Bureau of Prisons (hereinafter "FBOP") categorically prohibits certain

    treatments for reasons wholly unrelated to medicine or law.

---

[1] In keeping with Ms. Langan's gender identity, judicial practice, accepted medical standards, and social standards of respect and dignity, this document will use the name Donna and feminine pronouns and honorifics to refer to Ms. Langan.  *Cf. Rosasa v. Hudson River Club Rest.*, 96 Civ. 0993 (JFK), 1997 U.S. Dist. LEXIS 8115, at *2 (S.D.N.Y. June 10, 1997).  *See also*, *Stanley v. City of N.Y.*, 71 Misc. 3d 171, 184 n.5 (N.Y. Sup. Ct. 2020) (collecting authority on using a transgender person's abandoned name — or "deadname" — and concluding that "Courts addressing the issue have almost uniformly found the practice hostile, objectively offensive, and degrading") (quoting Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. Rev. Disc. 40, 43 (2020) (*citing G. G. ex rel. Grimm v Gloucester Cty. Sch. Bd.*, 822 F3d 709, 716 (4th Cir 2016))).

1

2. Donna Langan, a 63 year old transgender woman confined in the FBOP experiences debilitating anguish as a result of severe and inadequately treated gender dysphoria.

3. To alleviate this suffering, and the other harms and risks of harm she faces as a result of sex-based discrimination, she has for decades sought, and now seeks via this complaint, gender confirming surgeries (hereinafter "GCS"), most urgently vaginoplasty.

4. By the time she was four, Ms. Langan knew she had been misidentified as a boy. Her entire life has been shaped by the agonizing tension between the immutability of her gender identity and the often life-or-death danger of publicly living her truth.

5. As a result of the stigma of being a trans woman, she has endured exploitation and sexual violence, discrimination and exclusion, and the loss of stable community and family.

6. In spite of the various social impediments to living openly as a woman, up to and including potentially lethal violence, and despite the many times she has made the anguished choice to conceal her gender in order to maintain critical relationships, at no time during her life has Ms. Langan's gender identity shifted.

7. Ms. Langan is transgender. Just like being cisgender (meaning "not transgender"), being transgender is natural and is not a choice, or a psychiatric condition. *See* Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* (2012).

8. Ms. Langan, like many trans[2] people, has been diagnosed with gender dysphoria ("GD").

9. GD is the distress caused by a discrepancy between a person's gender identity and that person's sex assigned at birth.

---

[2] "Trans" is used interchangeably with "transgender," and both are adjectives.

10. GD is a serious, but ***highly treatable*** medical condition, for which safe, effective, accessible treatments have existed for decades.

11. Since Ms. Langan's entry into the FBOP in 1996, FBOP medical staff have repeatedly confirmed and validated her diagnosis of gender dysphoria – again, a serious medical condition.

12. FBOP medical staff have repeatedly assessed her and have communicated to FBOP that despite receiving some treatments, she "continues to meet diagnostic criteria for Gender Dysphoria… associated with clinically significant distress in social functioning." *See* Updated Mental Status Report of January 29, 2019, Clinical Director Dr. Charles Langham.

13. FBOP nevertheless refuses to approve Ms. Langan for GCS, a safe, and highly effective treatment for Ms. Langan's currently unmet serious medical need.

14. Significantly, FBOP neither offers any alternative treatment to GCS, nor disputes her treating physicians' assessment that her gender dysphoria is a serious medical need for which GCS is the appropriate treatment.

15. Without that medical intervention, Ms. Langan's life is now and will continue to be in peril.

16. Ms. Langan therefore brings this action for declaratory and injunctive relief to compel Defendants to render to her the medical treatment they are constitutionally and statutorily required to provide.

**PARTIES**

17.  Plaintiff Donna Langan is a 63-year-old transgender woman in the custody of the FBOP at FMC Carswell, in Fort Worth, Texas, a medical facility for women.

18. Defendant Federal Bureau of Prisons ("FBOP") is the federal executive agency charged with managing and regulating all federal penal and correctional institutions, including FMC

Carswell. The FBOP is responsible for Ms. Langan's medical care, for protecting her from certain harms, and for compliance with Constitutional mandates and Executive Orders. The Bureau is headquartered in Washington, D.C.

19. Defendant Michael Carvajal is the current Director of the FBOP. As director, Defendant Carvajal is the ranking official in the FBOP, and is responsible for the administration of all FBOP operations, including the form, substance, and implementation of Program Statements and other written policies, and the practical realities of all aspects of FBOP administration, including the conduct of FBOP employees, contractors, and lower authorities. On information and belief, Mr. Carvajal is the final decision-maker for treatment decisions made by the FBOP Health Services, the FBOP's Medical Directors, and the FBOP's Transgender Executive Council ("TEC"). Mr. Carvajal is sued in his individual and official capacities, pursuant to *Bivens*. 403 U.S. 388 (1971).

20. Defendant Ian Connors is the National Inmate Appeals Administrator in the Office of General Counsel for the FBOP. He, among other named Defendants, has been responsible for reviewing and denying, or constructively denying, Ms. Langan's well-supported requests and administrative appeals for GCS. He is sued in his individual and official capacities.

21. Defendant Doe, on information and belief an attorney for FBOP, is responsible for having made a decision to suspend consideration of Ms. Langan's request for necessary medical care to treat a serious medical condition on the basis of non-medical considerations, in furtherance of a *de facto* blanket ban on gender confirming surgeries. Defendant Doe is sued in their individual and official capacities.

22. Defendant Dr. Elizabeth Stahl is the Clinical Director of the FBOP Health Services Division. She is responsible for medical, dental, and mental health services provided to Federal prisoners

in Bureau facilities, including health care delivery, infectious disease management, and medical designations. She is sued in her individual and official capacities.

23. FBOP Transgender Executive Council (hereinafter "TEC") is the FBOP entity that reviews medical recommendations regarding treatment for transgender prisoners, including Ms. Langan.[3] The TEC is comprised of FBOP management personnel, including non-medical personnel, who oversee the FBOP's clinical treatment recommendations for transgender prisoners such as Ms. Langan. *See* FBOP P.S. 5200.04, the revised Transgender Offender Manual, 2018, *available at https://www.bop.gov/policy/progstat/5200-04-cn-1.pdf*. The members of the TEC are responsible for constructively denying Ms. Langan's request, on the recommendations of her treating physicians, for GCS. Each member of the TEC, including Dr. Alison Leukefeld, Shannon Robbins, Don Lewis, and Jennifer Epplin, is sued in their official and individual capacities.

   a. John and Jane Doe(s) 2-11 (collectively, the "TEC Does") whose true names are unknown, are individuals who, as agents of FBOP's TEC, did or ratified acts, or failed to do or ratify acts, that caused harm to Ms. Langan. She will amend this complaint after discovery determines the identities of these Doe defendants. They are sued in their official and individual capacities.

24. The Transgender Clinical Care Team (hereinafter "TCCT") is the organization of individuals, on information and belief including non-medical personnel, responsible for reviewing decisions or recommendations about the medical care of only transgender prisoners,

---

[3] On information and belief, the TEC claims not to "make" decisions about medical care, but since they review recommendations without either approving or denying them, and since, on information and belief, their approval is requisite to any action on the part of the doctors, they are in effect making medical decisions by leaving trans people in perpetual limbo with respect to, in particular, gender confirming surgical treatment recommendations.

including Ms. Langan.[4] *See* Medical Management of Transgender Inmates, Federal Bureau

of Prisons Clinical Guidance document, 2016, *available at*:

https://www.bop.gov/resources/pdfs/trans_guide_dec_2016.pdf.

    a.   John and Jane Doe(s) 12-21 (the "TCCT Does"), whose true names are unknown, are

        individuals who, as agents of FBOP's TCCT, did or ratified acts, or failed to do or

        ratify acts, that caused harm to Ms. Langan. She will amend this complaint after

        discovery determines the identities of these Doe defendants. They are sued in their

        official and individual capacities.

## JURISDICTION AND VENUE

25. Plaintiff brings this suit pursuant to the Eighth and Fifth Amendments to the United States

    Constitution, and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116.

26. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and §1343(a)(4).

27. Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendant FBOP is an

    agency of the United States.

28. Venue is further appropriate in this district under 28 U.S.C. § 1391(e)(1)(B) because

    Defendants are employees and agencies of the United States and a substantial part of the

    events and omissions giving rise to Plaintiff's claims — namely, the refusal to approve and

    abide by the recommendations of Plaintiff's doctors, and all ultimate decisions not to provide

    appropriate treatment — took place within the District of Columbia.

---

[4] The TCCT, like the TEC, is a bureaucratic organ the decision-making power of which is unclear. It appears that both the TEC and the TCCT have the power to review the recommendations of care providers; it is not clear whether or to what degree they can make conclusive determinations. What is evident is that they do not approve or deny care, that the treating physicians cannot act without the imprimatur of those bodies, and that trans patients are thus kept in a permanent condition of treatment paralysis with respect to surgically gender affirming treatments.

## STATEMENT OF FACTS

### I.   Background On Gender Identity and Gender Dysphoria

29. A person's sex is determined by sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics are not always in alignment with each other according to common understandings of binary sex.

30. "Gender identity" is the medical term for a person's understanding of their own gender, and is the primary determinant of what is colloquially referred to as "sex."

31. In this sense, it refers neither to the chromosomal markers that are themselves only a rough shorthand for commonly invoked binary genders,[5] nor to the "sex assigned at birth," which is itself delivery-room shorthand for the appearance of the infant's external reproductive organs.[6]

32. Everyone has a gender identity, and gender typically figures as a prominent, often core attribute of an individual's personal, psychological, and social life.

---

[5] Chromosomal markers are neither the only sex-determining genetic markers, nor are they as uncomplicated as the "XX" or "XY" markers associated with sex in the popular imagination. See, e.g.: Lehrman, S. (2007, May 30). When a Person Is Neither XX nor XY: A Q&A with Geneticist Eric Vilain. *Scientific American.* Available online at: https://www.scientificamerican.com/article/q-a-mixed-sex-biology/. Annenberg Learner. (2018.) "Biology of Sex and Gender: Expert Interview Transcripts, Eric Vilain, MD, PhD." Available online at: https://www.learner.org/courses/biology/units/gender/experts/vilain.html

[6] Medical staff assign a *sex* based on the appearance of external genitalia at the time of a child's birth. This does not, as noted in note 4 above, always fall neatly into a single binary category or comport with that child's chromosomal makeup; more to the point, *sex* (a set of biological characteristics expressed in primary sex organs and secondary sex characteristics) is different and distinct from *gender* (a social and cultural construct). See, e.g.: The New Science of Sex and Gender, Editors of Scientific American, *available at* https://www.scientificamerican.com/article/the-new-science-of-sex-and-gender/ last visited August 4, 2021; see also "Human Anatomy Laboratory Manual" Regula, Lis. (2020) Kendall Hunt Publishing. Dubuque, IA, page 412.

33. For most people, their sense of gender is intrinsic, and not subject to influence or alteration by coercive social pressures or even outright punishment.

34. Efforts to change someone's gender identity are not only futile but dangerous, leading to distress or even suicide.

35. Many people identify as either male or female, and this identification is often, but not always based on the sex they were assigned at birth.

36. Persons who identify with the sex they were assigned at birth can be referred to as cisgender ("cis-" meaning "the same as"). People whose gender identity does not conform to the sex they were assigned at birth may identify as transgender.

37. A trans man is a man who was assigned female at birth. A trans woman is a woman who was assigned male at birth.

38. Both cisgender and transgender identities are natural.

39. While being transgender is not a mental disorder, transgender people may experience gender dysphoria. Gender dysphoria[7] is recognized by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V) and the World Health Organization in the International Classification of Diseases (ICD-10). The World Professional Association for Transgender Health (WPATH) defines gender dysphoria as "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)" WPATH Standards of Care, p. 5.

---

[7] Gender Dysphoria is the term now used by the DSM-V instead of the more stigmatizing and less accurate "gender identity disorder," which was used in the DSM-IV.

40. GD derives from the external conditions that contravene a person's gender, and is thus treated by alleviating the medical, psychological, and social barriers to living fully within the individual's gender identity.

41. If untreated or mistreated, gender dysphoria can lead to serious risks and harms, including both physical and mental health effects.

42. Gender dysphoria is a serious medical condition, but it is extremely treatable. For decades, the medical community has been aware of safe, highly effective treatments for GD.

43. These treatments vary according to the needs of the individual, but typically involve components of the following: 1) social transition to adopting gender roles, names, and style; 2) hormone therapies, which can alter some secondary sex characteristics; 3) therapy, largely to process and build resilience to stigma; and 4) genital ("bottom") and/or chest ("top") surgery to bring the body into conformity with the individual's gender. *Id.* pages 9-10.

44. FBOP medical staff and administrators concur that Ms. Langan suffers from GD.

45. Since at least 2017, FBOP medical staff have communicated to FBOP administrators that hormones, therapy, and social transition treatments are not adequately controlling Ms. Langan's GD. Genital surgery and other gender confirming surgeries, the last remaining treatment for GD, are medically necessary for the effective treatment of Ms. Langan's GD.

46. Defendants have refused to provide this treatment, citing no medical rationale.

47. In the absence of this care, Ms. Langan experiences extreme anxiety, depression, and the mental torture of feeling her core gender identity as inconsistent with her physical body. Much of that distress is focused on her genitalia, such that necessary daily tasks like toileting and showering are fraught with dread and anguish. She keeps suicidal ideation and thoughts

of self-harm at bay only by her hope of accessing the gender-affirming care she needs.

## II.   Accepted Standards of Care for Transgender Persons

48. The leading organization for transgender healthcare standards is the World Professional Association for Transgender Health (WPATH). WPATH publishes the Standards of Care, the seventh edition of which was published in 2012.[8]

49. The Standards of Care are used by surgeons, physicians, psychiatrists, psychologists, social workers, and other healthcare professionals who treat persons with gender dysphoria.

50. Many Courts have affirmed that the WPATH Standards of Care are "the internationally recognized" "consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric individuals."[9] *Edmo v. Corizon, Inc.*, 935 F.3d 757 at 769, 788 (9th Cir. 2019).

51. Every major medical professional association concurs that for many transgender individuals with gender dysphoria, surgeries are medically necessary and not elective.

52. The American Medical Association, Endocrine Society, American Psychiatric Association, the American Psychological Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the National Association of Social

---

[8] https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=1613669341

[9] *See also, Flack v. Wisconsin Department of Health Services* 395 F.Supp. 3d 1001 at 1014, 1015 (W.D. Wisc. 2019); *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), *vacated sub nom. Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020); *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730 (E.D. Va. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1170 (N.D. Cal.), appeal dismissed and remanded, 802 F.3d 1090 (9th Cir. 2015); *Campbell v. Kallas*, 936 F.3d 536, 551 (7th Cir. 2019); *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 543 (S.D. Ill. 2019), on reconsideration in part sub nom. *Monroe v. Meeks*, No. 18-CV-00156-NJR, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020); *Doe v. Pennsylvania Dep't of Corr.*, No. 120CV00023SPBRAL, 2021 WL 1583556, at *2 (W.D. Pa. Feb. 19, 2021), report and recommendation adopted, No. CV 20-23, 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021); *D.T. v. Christ*, No. CV-20-00484-TUC-JAS, 2021 WL 3419055, at *3 (D. Ariz. Aug. 5, 2021); *Pinson v. United States*, 826 F. App'x 237, 240 (3d Cir. 2020).

Workers, and the World Professional Association for Transgender Health, have already endorsed gender confirming surgeries as "medically accepted, safe, and effective treatments for gender dysphoria." *Flack v. Wisconsin Department of Health Services* 395 F.Supp. 3d 1001 at 1014, 1015 (W.D. Wisc. 2019).

53. The National Commission on Correctional Health Care ("NCCHC") is the leading organization of correctional health professionals.

54. NCCHC endorses the WPATH Standards of Care.

55. The WPATH Standards of Care apply to all trans people, regardless of their housing situations.

56. WPATH states that "[a]ll elements of assessment and treatment as described in the SOC can be provided to people living in institutions" and that "[a]ccess to these medically necessary treatments should not be denied on the basis of institutionalization [and] [d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations." *Id.* pages 67-68.

57. The WPATH standards set forth six diagnostic criteria for recommending genital surgeries, as follows: 1) persistent, well-documented gender dysphoria, 2) Capacity to make a fully informed decision and to consent for treatment, 3) age of majority in any given country, 4) If significant medical or mental health concerns are present, they must be well controlled, 5) 12 continuous months of hormone therapy as appropriate to the patient's gender goals […], and 6) 12 continuous months of living in a gender role that is congruent with their identity. WPATH Standards of Care, page 106, *available at*: https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf.

58. Ms. Langan meets and exceeds each of these six diagnostic criteria.

59. WPATH has unambiguously affirmed that "medical procedures attendant to gender affirming/confirming surgeries are not … optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition," continuing "In some cases, such surgery is the ***only*** effective treatment for the condition, and for some people genital surgery is essential and life-saving." WPATH Statement on Medical Necessity, Dec. 21, 2016, *available at:* https://www.wpath.org/newsroom/medical-necessity-statement.

60. FBOP has provided Ms. Langan with three of the four recognized treatments for GD: changes to gender expression or role; hormone replacement therapy; and psychotherapy to promote resilience, address stigma, and increase self-esteem.

61. But FBOP has denied Ms. Langan access to the fourth treatment option – surgeries – despite knowing that GCS is a medically necessary treatment for a serious medical need, and that Ms. Langan's GD is not being adequately treated by the other three treatments.

62. The medical consensus regarding GCS is acknowledged by every major medical and psychological association in the United States, the United States Department of Justice, and even the Federal Bureau of Prisons itself.

**III.     Standards of Care as Reiterated in the FBOP's Transgender Offender Manual and Other Program Statements**

63. The FBOP sets forth its governing policies in "Program Statements" (hereinafter abbreviated as "P.S.").

64. P.S. 5200.04, titled The Transgender Offender Manual ("TOM") authorizes or mandates the FBOP to render appropriate gender transition related medical treatment following an

individual assessment, including referrals to both medical services and psychotherapy. P.S. 5200.04 *available at: https://www.bop.gov/policy/progstat/5200-04-cn-1.pdf*.

65. P.S. 6010.05 ensures that prisoners have access to evidence-based care, and reiterates the Eighth Amendment's imperative that all prisoners be given medically necessary care. P.S. 6010.05, *available at: https://www.bop.gov/policy/progstate/6010-005.pdf*.

66. P.S. 6031.04 outlines the procedures necessary to approve and to provide prisoners with medically necessary care. P.S. 6031.04, *available at: https://www.bop.gov/policy/progstate/6031-004.pdf*.

67. Both P.S. 6010.05 and 6031.04 include in their purpose the provision of medical care "in accordance with proven standards of care without compromising public safety concerns inherent to the Bureau's overall mission."

68. The FBOP's own program statements, including the Transgender Clinical Care Guide set forth a clear path to the provision of GCS, and in fact Ms. Langan's care providers, employed by the FBOP, have followed that path in individually evaluating her for GCS, and communicating to the TEC and TCCT that Ms. Langan needs GCS to treat her diagnosed GD.

69. On information and belief, the TEC[10] and TCCT[11], are made up of people who have never seen or treated Ms. Langan.

---

[10] The TEC is a body established by the FBOP under Program Statement 5002.04, The Transgender Offender Manual. The TEC consists of "staff members from the Health Services Division, the Female Offender Branch, Psychology Services, the Correctional Programs Division, the Designation and Sentence Computation Center (DSCC), and the Office of General Counsel." The identities of the TEC members and therefore their qualifications are currently unknown; discovery may clarify whether or to what degree TEC or TCCT members are actually possessed of any clinical competence, expertise, or authority. Counsel wishes to reserve further pleadings in this regard.

[11] Assuming the BOP followed the protocol set forth in the Clinical Care Guide (See document available at https://www.bop.gov/resources/pdfs/trans_guide_dec_2016.pdf), Ms. Langan's requests for GCS should also have been submitted to the TCCT, which should have made a recommendation to the medical director.

70. Every single person with medical expertise or clinical credentials who has evaluated Ms. Langan has recommended GCS to treat her diagnosed GD.

71. The TEC and TCCT are made up of people, many of whom, on information and belief, have no medical expertise or clinical credentials whatsoever.

72. Thus, the TEC and TCCT are making medical decisions on the basis of non-medical judgments.

73. The TEC and TCCT exist specifically and only to make decisions about the medical care of only transgender prisoners.

74. The medical care of cisgender prisoners and prisoners who are not diagnosed with GD is not overseen by non-medical personnel.

75. A cisgender man whose doctor recommends an orchiectomy for the treatment of any condition other than GD, such as testicular cancer, would not have the treating physician's recommendation monitored or commented upon or delayed by non-medical personnel.

76. Nor would that cisgender man have that recommendation monitored or commented upon by the TEC or the TCCT.

77. A cisgender woman whose doctor recommended a double mastectomy and hysterectomy for the treatment of any medical condition other than GD, such as breast or uterine cancer, would not have the recommendation monitored or commented upon or delayed by non-medical personnel.

78. Nor would that cisgender woman have that recommendation monitored or commented upon by the TEC or the TCCT.

14

79. Upon information and belief, there is no similar body to either the TEC or the TCCT that exists and monitors, comments on, and controls medical care for cisgender prisoners similarly situated to Ms. Langan.

80. At a minimum, the requirement that the medical care of transgender prisoners or prisoners with a diagnosis of gender dysphoria be supervised by two separate bodies, neither of which includes the patient's treating care providers, and both of which, on information and belief, include non-medical personnel, who interfere with and override the medical decisions of the actual treating care providers, contributes to, as in this case, extreme delay in the provision of medically necessary care, and a separate, unequal system of healthcare for some prisoners, explicitly on the basis of sex, gender identity, and GD diagnosis.

**IV. Plaintiff Langan's Efforts to Access Effective Treatment for Gender Dysphoria**

81. At the time of the arrest leading to her current incarceration, Ms. Langan was diagnosed with "Gender Identity Disorder" – a diagnosis since replaced in the DSM V by Gender Dysphoria.

82. Since 1996, Ms. Langan has at various times requested all of the possible treatments for gender dysphoria, including designation to a women's facility to facilitate social transition, individualized psychotherapy, feminizing hormones and masculine hormone blockers, and vaginoplasty, breast augmentation, and permanent hair removal.

83. Since 2012, the FBOP has been rendering some forms of gender affirming care to Ms. Langan, including hormone therapy, counseling, and designation to a women's facility.

84. According to the undisputed conclusions of FBOP medical staff, Ms. Langan has GD, a serious medical need, that has not been adequately treated by current clinical interventions, which constitute three of the four possible treatments for GD.

85. Only genital surgery to bring the body into conformity with the individual's gender, known to be safe and effective, remains to treat Ms. Langan's GD. She meets or exceeds the clinical criteria for this surgery.

86. On information and belief, no federal prisoner has ever been approved for any GCS. See *Fisher v. Federal Bureau of Prisons*, 4:19-cv-01169-SL, Deposition of Dr. Elizabeth Stahl, Dkt. 63, p. 20, line 13; page 22, line 4.

87. Upon information and belief, the TEC and TCCT have recommended against — and otherwise prevented — GCS for all prisoners in the federal prison system who have sought it as a treatment for GD.

88. FBOP has neither offered an alternative treatment to supplement the currently insufficient treatments, nor disputed that the current treatment is inadequate and that GCS is medically necessary; nevertheless FBOP has not approved Ms. Langan for GCS.

89. Since 2016, Ms. Langan has continuously requested GCS through the appropriate administrative channels.

90. These requests have never been approved or denied. Instead, as described below, Ms. Langan has pursued the administrative remedy process several times all the way up the decisional chain, each time culminating in constructive denials by way of non-decision, with administrators communicating that consideration of her request has been stayed.

91. In 2016,[12] when Ms. Langan was designated to the women's facility at FMC, Carswell, she was routinely seen by Dr. Benjamin Quick, who consistently noted Ms. Langan's persistently expressed need for GCS.

---

[12] Ms. Langan has been requesting GCS almost since her entry into FBOP custody. After the "freeze-frame" policies were found to be violative of the Eighth Amendment, she was recommended for hormone therapies, and several years after that she was redesignated to FMC, Carswell. For purposes of this complaint, only more recent

92. On information and belief, Ms. Langan's request for GCS, along with her medical records, was sent to the TEC in November, 2016.

93. Her request for GCS was sent to the TEC and TCCT, along with evaluations demonstrating the risks of harm posed by continued denial of GCS, including ongoing severe clinical depression and anxiety.

94. After the TEC was notified of Ms. Langan's request and given access to her medical records, it did not respond at all for over **two years**, and has **never** responded in writing.

95. In the interim, in May, 2017 Ms. Langan was evaluated by social worker T. Finch Hall, whose detailed report indicated that she met all diagnostic criteria for GCS, and that as a result of her inadequately alleviated GD, she continued to experience ongoing and severe anxiety and depression.

96. On information and belief this report was sent to supplement the TEC file shortly thereafter.

97. During that time Ms. Langan filed multiple administrative appeals, including an informal resolution attempt in June, 2017, and an administrative appeal dated September 20, 2017, without ever receiving any affirmative response or denial.

98. On October 24, 2017, nearly a year after the TEC is believed to have received her file, Defendant Ian Connors finally responded to her appeal, saying only that the decision *not to make a decision* was not politically motivated, and claiming (falsely) that Ms. Langan did not request any specific relief.

99. The 2017 Connors response concludes that Ms. Langan is already receiving some treatment, neither disputing that the treatment is insufficient to treat her severe GD, nor offering an alternative treatment to supplement the currently inadequate treatments she is receiving.

---

administrative remedies will be discussed, but it should be understood that Ms. Langan has continuously engaged with the administrative remedy system in an effort to access GCS that now spans more than two decades.

100. The 2017 Connors response makes no determination about her request for GCS.[13]

101. In 2018 Ms. Langan renewed her requests for GCS, and after receiving no substantive response, filed multiple requests and received multiple non-responses, including:

    a. Request to Staff of April 24, 2018, asking Dr. Langham whether he has completed the recommendation to the TEC or heard back from the TEC regarding her previous, ongoing request for GCS;

    b. Request to Staff of April 24, 2018, asking Warden Campos if he had had any response from the TEC regarding her request for gender reassignment surgery;

    c. Associate Warden Campos' May 4, 2018 response that her "request has yet to be reviewed";

    d. BP-9 dated September 18, 2018, objecting to the fact that the FBOP had not acted on her request for GCS;

    e. Response of Warden Jody Upton, dated October 25, 2018, saying only that the TEC "has not approved or denied your request at this time."

    f. BP-10 dated October 28, 2018, appealing the constructive denial of GCS and noting that GD is a documented serious medical need to which FBOP, in failing to respond, is being deliberately indifferent;

    g. Letter of J.F. Caraway, regional director, dated December 17, 2018, a response for "informational purposes only" that reiterates Ms. Langan's diagnosis, encourages

---

[13] This response in particular runs counter to the Department of Justice's own 2015 Statement of Interest in *Diamond v. Owens*, which says explicitly that prison officials can violate the Eighth Amendment even when they provide some medical treatment, if that treatment is inadequate as informed by medical professionals and standards of care. p. 11-12. See DOJ SOI *available at*
https://www.justice.gov/sites/default/files/crt/legacy/2015/06/12/diamond_soi_4-3-15.pdf

her to be compliant with her treatment, and continues FBOP's pattern of non-response to Ms. Langan's requests for GCS.

102.   In 2019, Ms. Langan continued to seek GCS and to use the administrative remedy structure to challenge the persistent nonresponse to her requests.

103.   On January 10, 2019, Ms. Langan filed a BP-11 Central Office administrative appeal (954143-R1) challenging the non-response of the FBOP, and outlining the various harms she was enduring, including "deep depression, suicidal ideation, thoughts of self-surgery… and risk of being sent back to a men's prison."

104.   Shortly after Ms. Langan sent the January 10, 2019 letter, Dr. Langham re-evaluated her.

105.   Dr. Langham's Updated Mental Status report of January 29, 2019 says, *inter alia*, that despite receiving some treatments, she suffers from the protracted and profound stress of the ongoing constructive denial of clinical care, and "continues to meet diagnostic criteria for Gender Dysphoria… associated with clinically significant distress in social functioning."

106.   The report also details with specificity facts demonstrating that Ms. Langan satisfies each of the six WPATH benchmarks for genital surgery.

107.   Put differently, Dr. Langham's medical and professional conclusion was that Ms. Langan meets each of the six WPATH criteria for GCS and GCS is medically necessary for Ms. Langan.

108.   On March 29, 2019, Defendant Ian Connors sent Ms. Langan a response to her appeal, asserting that her request was still "being considered" by the TEC, and that ***no decision had yet been made***.

109.    On April 22, 2019, Dr. Charles Langham drafted a memo to the TCCT, saying that Ms. Langan had "fulfilled all the requirements [for genital surgery] as set forth by Clinical Guidance, 2016, Medical Management of Transgender Inmates, page 19."

110.    Attached to the April 22, 2019 memo were updated evaluations of and notes on Ms. Langan by Drs. Langam and Quick, who routinely affirmed that Ms. Langan suffers ongoing harm as a result of her inadequately treated GD, including the possibility of targeted violence, as well as the severe psychological harm constituted by unceasing dysphoria.

111.    On July 16, 2019, Carswell's Assistant Warden Campos verbally communicated to Ms. Langan that the TEC had "suspended" consideration of her request.

112.    On August 25, 2019, Ms. Langan memorialized this conversation in an email to Assistant Warden Campos, and further memorialized that email in a Request to Staff, in which she asks for "official written confirmation that the BOP has not made any decision yes or no in regards to my repeated requests…".

113.    In the same email, she asks for clarification regarding the Warden's verbal reference to "*Gibson v. Green.*"

114.    In their conversation, the Warden had referred to a Court of Appeals case as "*Gibson v. Green*," suggesting that the Warden had been instructed that this case was in some manner related to FBOP's refusal to make a decision about Ms. Langan's requests for medically necessary GCS.

115.    Upon information and belief, neither the TEC nor the TCCT provided any medical basis for their suspension of consideration of Ms. Langan's request.

116.    Instead, upon information and belief, Defendant Doe 1 made a decision that ***no*** transgender prisoner in the Fifth Circuit — because of "*Gibson v. Green*" — would be given GCS,

regardless of the degree of medical necessity or the recommendations of that prisoner's doctors.

117.    Ms. Langan was never given anything in writing regarding the suspension of consideration of her request.

118.    Ms. Langan therefore wrote a letter dated September 10, 2019, and addressed to FBOP with attention to the TEC, the Transgender Clinical Care Team, the Medical Director and "other interested parties".

119.    It was only then that she received a written response, a letter from Corinne M. Nastro, Assistant General Counsel for the FBOP, dated October 7, 2019, reasserting that the TEC was "staying any further consideration" of the surgeries.

120.    The letter staying consideration of Ms. Langan's request for GCS did not rely on any assessment of medical necessity.

121.    The letter staying consideration of Ms. Langan's request for GCS did not rely on any coherent legal analysis.

122.    Based on a reference to *Gibson v. Collier* (as opposed to "*Gibson v. Green*") a case that is not binding on FBOP and in any event, does not prohibit the provision of medically necessary GCS, the Nastro letter does suggest that the FBOP has a *de facto* blanket ban on GCS, at least for all prisoners in the geographic confines of the Fifth Circuit, and that such blanket ban either originates in and/or is enforced by the FBOP Office of General Counsel.

123.    The letter staying consideration of Ms. Langan's request for GCS did not rely on any allegation of security risk, and not only does no such risk exist, it would not be relevant to the provision of medically necessary care.

124.    Ms. Langan has exhausted her administrative remedies.

125.    Further efforts on her part would be futile, obviating any further obligation on her part to pursue remedies from within the FBOP's own administrative system.

126.    It should be noted that since 2019, Ms. Langan has nevertheless continued to file requests for GCS.[14]


## V.  HARM AND RISK OF HARM

127.    Ms. Langan experiences on a daily basis serious depression, anxiety, suicidality, and an intrusive, compulsive desire to perform self-surgery.[15]

128.    Asking to be heard by the Court in her own words, Ms. Langan said: "I'm not in a good place. I'm constantly on edge. Even though I have never made a direct suicide attempt I have in the past put myself in such life-threatening situations that my death was a likely outcome. Without having GCS I have a sense that life is not worth trying to preserve. I contemplate suicide and self-surgery but since it would destroy my chances to have professional surgery I wouldn't do it. But the thoughts remain."

129.    Ms. Langan added that after some long-ago attempts at self-orchiectomy, she doesn't engage in self-surgery because she has "never lost hope" that she will be able to access professional surgery. As she ages, she says, she is beginning to feel increasingly hopeless.

130.    She described this as a Catch-22, where "If you hurt yourself, they will say you're too unstable to get surgery, and if you don't hurt yourself, the FBOP assumes you aren't actually suffering."

---

[14] In addition to the efforts of undersigned counsel to communicate directly with FBOP Office of General Counsel, beginning on or around December, 2020, Ms. Langan has continued to seek administrative relief. Remedies include a request for GCS that was filed in February, 2021, along with a request for a reduction in sentence (denied by Ian Connors July 13, 2021), a request for GCS filed August 17, 2021, to which she has received no response, and an appeal of that constructive denial filed September 16, 2021.

[15] Self-surgery must be understood as distinct from the desire to self-harm. It is a desire to perform corrective, ultimately healing surgery, and not a desire rooted in depression, self-punishment, or self-abnegation.

131.    Ms. Langan's gender dysphoria is continuously exacerbated by the denial of access to

vaginoplasty and other gender confirming surgeries.

132.    This dysphoria is increasingly unsustainable, and is experienced by Ms. Langan as

excruciating mental torture.

133.    She brings the following claims for relief.


**CLAIMS FOR RELIEF**

**<u>FIRST CLAIM FOR RELIEF</u>**

**Failure to Provide Medically Necessary Treatment in Violation of the Eighth Amendment**

*Against FBOP, Defendant Carvajal, Defendant Stahl, Defendant Connors, Defendant Doe 1, Dr.
Alison Leukefeld, Shannon Robbins, Don Lewis, Jennifer Epplin, and TEC Does and TCCT Does
in their individual and official capacities*

134.    Ms. Langan realleges and incorporates by reference all facts set forth in previous

paragraphs of this Complaint.

135.    Defendants, including the FBOP, Carvajal, Stahl, Connors, Doe, and TEC and TCCT

defendants, are responsible for providing adequate and necessary medical care to Ms. Langan.

136.    Specifically, Defendant Carvajal is responsible for ensuring that executive policy and the

constitution are consistent with FBOP policies and complied with in all federal prisons.

137.    Defendant Stahl is responsible for ensuring that the serious medical needs of prisoners are

treated.

138.    TEC and TCCT defendants are responsible for providing advice and guidance to FBOP

regarding treatment relevant to Ms. Langan's needs as a trans woman, although as noted above,

the very existence of these bodies is discriminatory and Constitutionally suspect.

139.   Defendant Doe 1 is, on information and belief, an attorney in the FBOP Office of General Counsel, responsible for understanding and applying the law as it relates to the provision of medical care for gender dysphoria.

140.   Defendants have long been aware that Ms. Langan has been diagnosed with the medical condition of gender dysphoria, the treatment of which constitutes a serious medical need.

141.   Defendants are all aware that Ms. Langan has been evaluated many times over the last more than thirty years, and that within the last five years FBOP medical staff have uniformly found that she meets all diagnostic criteria for GCS.

142.   Defendants are all aware that *no* medical professional actually treating or evaluating Ms. Langan believes that she should not receive GCS.

143.   Defendants are all also aware that Ms. Langan has not received the necessary gender confirming surgeries, most urgently vaginoplasty, but also including breast augmentation, and the associated permanent hair removal (requisite to the genital surgery) for which she has been recommended, indeed, they are so aware because they are responsible for the denial of that care, contrary to the recommendations of her doctors.

144.   Defendants have failed to follow the FBOP's own written policies.

145.   Instead, on information and belief, Defendants appear to be acting in accordance with an *unwritten de facto* policy that operates as a categorically unlawful blanket denial of gender confirming surgeries for all trans patients in FBOP custody.

146.   The FBOP also has, upon information and belief, an express ban on surgeries for any prisoners housed in a federal prison in Texas, Louisiana, and Mississippi.

147.   Defendants have failed to understand and apply relevant law, and have acted contrary to controlling law, in failing to provide medically necessary care for Ms. Langan.

148.   Defendants' acts and/or omissions resulting in deficient care for Plaintiff reflect Defendant's policy, custom, practice, and/or procedure of failing to provide adequate and necessary medical treatment to people who are incarcerated and diagnosed with gender dysphoria.

149.   Each Defendant has been and remains deliberately indifferent to Plaintiff's serious medical need to be adequately treated for gender dysphoria by ignoring Plaintiff's treating physician's treatment recommendations, since at least 2017, that gender confirmation surgery is clinically indicated and medically necessary in their professional opinion.

150.   Each Defendant has known of Plaintiff's serious medical need for treatment for gender dysphoria and denied reasonable measures to address Plaintiff's continued pain and suffering resulting from her inadequately treated gender dysphoria.

151.   All defendants are or should be aware that providing "some" medical care for a serious medical need is not categorically sufficient to avoid an Eighth Amendment violation.

152.   Defendants' continued denial of necessary medical treatment is causing irreparable harm and unnecessary suffering to Plaintiff, including clinically significant depression and anxiety, and suicidal ideation.

153.   Defendants' failure to provide adequate and necessary medical treatment to Plaintiff violates the Eighth Amendment to the U.S. Constitution.

154.   Without necessary medical treatment, the condition continues to inflict serious mental distress on Plaintiff. Ms. Langan alleges that she has only avoided serious physical harm by acutely developing her own coping mechanisms and conflict avoidance skills.

155.   As a direct and legal result of Defendants' actions and omissions, Plaintiff has suffered, and continues to suffer damages including, without limitation, pain and suffering; emotional,

psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

156.    Every single day Plaintiff does not receive GCS causes her irreparable harm.

157.    Defendants, by engaging in the aforementioned acts or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard for the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

158.    It is unconstitutionally cruel and unusual to expose a prisoner to a substantial risk of serious harm.

159.    Denying an incarcerated transgender person the right to live fully within and as their gender identity predictably causes harm.

160.    Much like excessive periods of solitary confinement can predictably generate serious mental health crises among otherwise mentally healthy persons with no history of mental health needs, institutional refusal to render medically necessary gender confirming care, including surgery, can create or exacerbate anxiety, depression, and dysphoria, in turn creating or increasing the likelihood of self-harm or suicide.


**SECOND CLAIM FOR RELIEF**

**Denial of Medical Care on the Basis of Sex or Gender in Violation of Fifth Amendment Rights to Equal Protection**

*Against FBOP, Defendant Carvajal, Defendant Stahl, Named TEC Members, TEC Does and TCCT Does, Defendant Connors, and Defendant Doe 1 in their individual and official capacities*

161.    Plaintiff realleges and incorporates by reference all facts set forth in previous paragraphs of this Complaint.

162.    The Fifth Amendment's Due Process Clause guarantees persons the equal protection of the laws and bars the Federal Government from treating persons differently than similarly situated others. Review of Fifth Amendment equal protection claims is identical to the adjudication of claims under the Fourteenth Amendment. *Sessions v. Morales*, 137 S. Ct. 1678, 1686 n.1 (2017); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

163.    Under the equal protection guarantees of the Constitution, discrimination against transgender people is presumptively unconstitutional and subject to at least heightened scrutiny. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. Aug. 26, 2020), as amended (Aug. 28, 2020); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*, No. CV 20-11297-PBS, 2021 WL 3667760, at *15 (D. Mass. Aug. 18, 2021); *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1737 (2020); *Adams v. Sch. Bd. of St. Johns Cty.*, —— F.4th ——, 2021 WL 2944396, *4 (11th Cir. 2021).

164.    Defendants have discriminated against Plaintiff based on her sex and transgender identity by denying her adequate and necessary medical treatment for gender dysphoria.

165.    Specifically, Defendants have denied Plaintiff necessary medical care because she is transgender, because she is attempting to transition genders, and/or because of Defendants' sex-based belief that people who are assigned male at birth should not receive medically necessary care that alters their genitalia, although cisgender prisoners may undergo identical procedures without interference or delay.

166.   Defendants discriminated against Plaintiff because of sex, sex stereotyping, and/or identity pursuant to official policies, procedures, customs, and/or practices.

167.   Defendants' discriminatory treatment of Plaintiff because of sex, sex stereotyping, and/or gender identity deprives Plaintiff of her right to equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution.

168.   Under the Equal Protection Clause, discrimination by the government based both on sex and transgender status is tested under heightened scrutiny and is therefore presumptively unconstitutional absent a showing by the government that the discrimination is substantially related to an important state interest.

169.    Transgender individuals as a group possess all the indicia of a suspect class that have been identified by the Supreme Court as triggering heightened scrutiny, including: (1) transgender people have experienced a history of discrimination; (2) transgender people are a discrete and insular minority who lack the political power to protect themselves through the legislative process; (3) being transgender does not limit or affect one's ability to contribute to society and (4) being transgender is a core part of one's identity so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

170.   Defendants' discriminatory treatment of Plaintiff because of sex, sex stereotyping, and/or gender identity is not substantially related to any important government interest, nor is Defendants' discriminatory treatment reflective of any legitimate government interest. Defendant's discriminatory treatment of Plaintiff on the basis of sex, sex stereotyping, and/or gender identity is also not reasonably related to any compelling, rational, or legitimate penological or other state interest.

171.    Defendant's discriminatory treatment is in direct contravention to existing law.

172.    As a direct and legal result of Defendants' actions and omissions, Plaintiff has suffered, and continues to suffer, damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

173.    Defendants, by engaging in the aforementioned acts or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard for the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.


### THIRD CLAIM FOR RELIEF
**Denial of Medical Care on the Basis of Diagnosis in Violation of Fifth Amendment Rights to Equal Protection**

*Against FBOP, Defendant Carvajal, Defendant Stahl, Defendant Connors, Defendant Doe 1, Dr. Alison Leukefeld, Shannon Robbins, Don Lewis, Jennifer Epplin, TEC Does, and TCCT Does their individual and official capacities*

174.    Plaintiff realleges and incorporates by reference all facts set forth in previous paragraphs of this Complaint.

175.    By official policy, procedure, custom and/or practice, Defendants discriminate against transgender prisoners diagnosed with gender dysphoria, including Plaintiff, by providing them with inferior and extremely delayed medical care as compared to similarly situated prisoners with medical and mental conditions and/or diagnoses other than gender dysphoria.

176.    Defendants' discriminatory treatment of Plaintiff because of her diagnosis of gender dysphoria deprives Plaintiff of her right to equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution.

177.    Defendants' discrimination against Plaintiff based on her diagnosis of gender dysphoria is not substantially related to any important government interest, nor is it even rationally related to any legitimate government interest. Defendants' discrimination against Plaintiff based on her diagnosis of gender dysphoria is also not reasonably related to legitimate penological interests.

178.    On information and belief, Defendants have created the TEC and TCCT to make decisions or advise on decisions about medical care for transgender prisoners, notwithstanding the recommendations of the treating providers.

179.    The TEC and TCCT do not address requests for similar kinds of care by non-transgender prisoners (by way of non-exhaustive examples, a cisgender male prisoner with a testosterone deficiency whose doctors order testosterone injections; or a cisgender female prisoner whose oncologist orders a double mastectomy).

180.    The TEC and TCCT have never approved any surgical intervention for any prisoner in the absence of a court order, ever.

181.    The TEC's existence and that of the TCCT constitute a "separate" and therefore inherently unequal mechanism for treatment of transgender prisoners or prisoners with gender dysphoria. *See generally, Brown v. Bd. of Educ. Of Topeka*, 347 U.S. 483 (1954).

182.    Because the TEC and TCCT have never approved any surgical intervention over the course of its entire existence, it does not constitute a serious attempt to provide treatment for transgender prisoners.

183.    Rather, it constitutes a bureaucratic smokescreen that functions to obscure a fundamental policy choice not to provide certain necessary treatment on the basis of sex:  necessary medical interventions are categorically denied by the TEC and TCCT on the basis of transgender status. *See Bostock v. Clayton Cty.*, 590 U.S. __ (2020).

184.    Put differently, the TEC's existence in itself, and that of the TCCT, and their use to instantiate a *de facto* blanket ban on GCS in particular, constitutes an unconstitutional, categorical bar on surgical interventions for transgender prisoners.

185.    It is similarly an unconstitutional, categorical bar on surgical interventions on the basis of diagnosis (e.g., gender dysphoria).

186.    Finally, as alleged above, for all prisoners in the confines of the Fifth Circuit Court of Appeals, the TEC, TCCT, and/or on information and belief, the FBOP Office of Counsel has explicitly instituted a categorical bar to surgical medical interventions on the basis of transgender status.

187.    That express, categorical prohibition of certain treatments on the basis of transgender status and or GD diagnosis is unconstitutional both on its face and as applied.


**FOURTH CLAIM FOR RELIEF**
**Violation of Affordable Care Act (42 U.S.C. § 18116)**

*Against FBOP, Defendant Carvajal, Defendant Stahl, Defendant Connors, Defendant Doe 1, Dr. Alison Leukefeld, Shannon Robbins, Don Lewis, Jennifer Epplin, TEC Does, and TCCT Does their official capacities*

188.    Plaintiff Ms. Langan repeats and re-alleges the allegations in all preceding paragraphs as if fully set forth herein.

189.    Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, prohibits covered entities from discriminating on the basis of sex for the purpose of providing health care services.

190.    Covered entities include "any health program or activity, any part of which is receiving

Federal financial assistance." The Federal Bureau of Prisons is a covered entity subject to the

ACA's nondiscrimination requirement.

191.    As set forth above, Defendants have and continue to discriminate against Plaintiff on the

basis of sex when they deny her adequate and necessary medical treatment on the basis that

she is transgender, has been diagnosed with gender dysphoria, and is attempting to transition

genders.

192.    As set forth above, Defendants have and continue to discriminate against Plaintiff on the

basis of sex when they deny her adequate and necessary medical treatment on the basis of sex

stereotyping and/or a belief that people who are assigned the male sex at birth should not

have genital surgeries, including vaginoplasty, predicate treatments such as permanent

genital hair removal, and other associated gender confirming treatments.

193.    As a direct and legal result of Defendants' actions and omissions, Plaintiff has suffered

and continues to suffer damages including, without limitation, pain and suffering; emotional,

psychological, and physical distress; violation of dignity; and other pecuniary losses not yet

ascertained.


**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons and any others that may appear to this Court, Plaintiff

requests judgment as follows, including:

a. Declaring that Defendants conduct in denying and constructively denying Ms. Langan

gender confirmation surgeries and attendant necessary health care violates her rights under the

Eighth and Fifth Amendments to the United States Constitution, as well as the Affordable Care Act;

b. Preliminarily and permanently enjoining Defendants, and their employees, agents, appointees, and successors, to follow the recommendations of Ms. Langan's health care providers and ensure that gender confirming surgeries, including most urgently bottom surgery, as well as breast augmentation, and effective permanent hair removal (specifically electrolysis or laser hair removal), together with all attendant necessary health care, are scheduled and completed for Ms. Langan within the next six months, with priority to the primary alleviating treatment of genital or "bottom" surgery;

c. Compensatory, general damages, and special damages, in an amount to be determined at trial;

d. Punitive damages against individual Defendants in an amount to be proven at trial.

e. Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

f. Reasonable costs of this suit and attorneys' fees and expenses, including under 28 U.S.C. § 2412 et seq. (the Equal Access to Justice Act); and

g. All such other and further relief as this Court deems just and proper.


DATED:        September 27, 2021
              NEW YORK, NY

                                                            Respectfully Submitted,



                                                            Moira Meltzer-Cohen[16]
                                                            277 Broadway, Suite 1501
                                                            New York, NY 10007

---

[16] Application for admission *pro hac vice* forthcoming

c: 347.248.6771
mo_at_law@protonmail.com

_____

J. Remy Green[17]

**COHEN&GREEN P.L.L.C.**
1639 Centre St., Suite 216
Ridgewood, New York 11385
Remy@FemmeLaw.com

Local Counsel:

_____

Christopher Leibig, VA BAR
# 40594
Member, United States
District Court for the District
of Columbia
114 N. Alfred Street
Alexandria, VA 22314
(703) 683-4310
chris@chrisleibiglaw.com

_____

[17] Application for admission *pro hac vice* forthcoming.